**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| **WILLIAM HUGHES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No: 10 C 5918** |
| **v.** | ) | |
| | ) | **Magistrate Judge Jeffrey Cole** |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

The plaintiff, William Hughes, seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act").  42 U.S.C. §§ 423(d)(2).  Mr. Hughes asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

## I.

## PROCEDURAL HISTORY

Mr. Hughes applied for DIB on June 26. 2006, alleging that he became disabled on June 1, 2006, due to chronic dry eye and eye pain, headaches, rapid heart beat, shortness of breath, and depression.  (R. 140-142, 198).  His application was denied initially and upon reconsideration. (R. 74-85).  Mr. Hughes filed a timely request for hearing.  An ALJ held a hearing on May 21, 2009, at which Mr. Hughes, represented by counsel, appeared and testified. (R. 27-71).  In addition, Thomas Guslove testified as a vocational expert.  (R. 65-70).  On September 18, 2009, the ALJ issued a decision finding

that Mr. Hughes was not disabled because he did not have a severe impairment – an impairment that would significantly limit his ability to perform basic work activity – prior to the expiration of his insured status on June 30, 2008. (R. 7-26). This became the final decision of the Commissioner when the Appeals Council denied Mr. Hughes' request for review of the decision on July 21, 2010. (R. 1-5). *See* 20 C.F.R. §§ 404.955; 404.981. Mr. Hughes has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## II.

## EVIDENCE OF RECORD

### A.

### Vocational Evidence

Mr. Hughes was born on October 26, 1976, making him thirty-two years old at the time of the ALJ's decision. (R. 140). His most recent job was as in customer service/phone sales from February to April in 2004. (R. 171). Prior to that, he worked in large machine sales, computer support and graphic design, and as a technical dispatcher and technical writer. (R. 171). These jobs were all performed mostly while sitting and required little lifting – no more than ten pounds at any time. (R. 171-178). For the purposes of receiving DIB, Mr. Hughes' insured status expired June 30, 2008. (R. 12, 126, 148, 155). Accordingly, the question is whether Mr. Hughes was disabled prior to that date. *Califano v. Sanders*, 430 U.S. 99, 101 (1977); *Allord v. Astrue*, 631 F.3d 411, 413 (7th Cir. 2011).

**B.**

**Medical Evidence**

On June 19, 2006, Mr. Hughes saw Dr. Michael McGarry, complaining of occasional heart palpitations occurring at rest, eye pain, nasal congestion, and ear pain. The doctor advised Mr. Hughes to undergo a Holter monitor, prescribed him medication for the ear and nasal problems, and told him to see an ophthalmologist for the eye problem. (R. 451). The next month, on July 13th, Mr. Hughes called the doctor's office and complained of worsening dyspnea (shortness of breath) on exertion. The doctor recommended he go to an emergency room (R. 452); he was seen at Resurrection Health Care's St. Francis Hospital that same day. (R. 457-62). Mr. Hughes recounted a three-week history of intermittent rapid palpitations which could occur at any time, shortness of breath with simple activity, and chest pain. His heart rate ranged from 117-140. An EKG was deemed normal but for a sinus rhythm with possible premature atrial complexes with aberrant conduction and premature ventricular complexes or fusion complexes. (R. 461). Mr. Hughes' heart rate came down following completion of the diagnostic studies including a negative stress test. (R. 462). The final diagnosis was simply palpitations. (R. 460).

Three days later on July 19, 2006, Mr. Hughes returned to the St. Francis Hospital emergency room with worsening chest pain which he described as a "ripping type" of pain. (R. 466). Tests were agin essentially normal and he was referred to Dr. McGarry later that day. (R. 467). The doctor described Mr. Hughes as "very anxious." (R. 453). Dr. McGarry also noted that Mr. Hughes was still having occasional palpitations with chest wall pain which the doctor attributed to a pectoral strain. He prescribed Naproxen

for the pain, Metropolol for the palpitations, and Buspar for anxiety.  (R. 453).  Two days later on July 21st, Mr. Hughes was noted as still having anxiety and Dr.McGarry added prescriptions for Zoloft –an anti-depressant – and Klonopin – an anti-anxiety medication.

At the end of July, Mr. Hughes saw Dr. McGarry to follow up on his palpitations and for ongoing pectoral pain. (R.  455).  On August 22, 2006, Mr. Hughes went to the Christ Hospital emergency room (R. 261-67) for palpitations and shortness of breath which he described as continuous.  (R. 262).  On August 31, 2006 Mr. Hughes saw Northwestern University Hospital Cardiologist Dr. John Jacobson who did an assessment of Mr. Hughes' palpitations.  The doctor noted that the palpitations were somewhat better on Altenol, but that Mr. Hughes was not tolerating the medication well due to side effects.  (R. 294).  Dr. Jacobson advised Mr. Hughes that the arrhythmias "while very symptomatic, (were) unlikely to be life threatening." (R. 294).  Dr. Jacobson recommended that Mr. Hughes undergo an event monitor while off the Altenol.  (R. 294).

On September 11, 2006, Mr. Hughes returned to Dr. McGarry.  (R. 456).  Mr. Hughes was not tolerating the medication that had previously been prescribed for his chest wall pain – it was causing stomach problems.  Because of ongoing chest pain and spasm, an injection of Kenalog and Lidocaine was administered to the right chest wall pectoral muscle.  (R. 456).

Later that month, on September 29, 2006, Mr. Hughes went to Christ Hospital, where Dr. Jonathan Wyatt evaluated the persistent pain in his breast and underarm.  The doctor recommended a rheumatology consult to rule out fibromyalgia and polymyositis and also recommended an MRI to rule out a bulging disc at the thoracic level (R. 279).  The following day, Mr. Hughes was back in the emergency room, complaining of

palpitations and chest pressure, this time at Palos Community Hospital.  Mr. Hughes was hospitalized through October 2, 2006.  (R. 475-500).  The admitting physician, Dr. Abdul-Hamid Shahbain, thought Mr. Hughes was suffering from anxiety and probable depression.  The palpitations responded to Flecainide, and their severity decreased.  (R. 485).  Mr. Hughes also saw Dr. Thomas Bump on October 1, 2006.  The doctor described Mr. Hughes' palpitations as "highly symptomatic" and that they are causing Mr. Hughes "extreme distress."  Dr. Bump described Mr. Hughes as "highly anxious and distressed" and said "in fact I am concerned about his emotional and mental state."  (R. 500).  A heart monitor showed occasional premature ventricular and atrial beats. Dr. Bump felt it was Mr. Hughes' emotional state, and not the premature beats, that was the more likely determinate of his extreme distress.  (R. 500).  Nevertheless, he called the palpitations "very disabling."  (R. 500).

On October 9, 2006, a 24-hour Holter monitor performed while Mr. Hughes was on Flecainide revealed "frequent premature atrial contractions which are felt by the patient as palpitations and occasional premature ventricular contractions . . . [but] no sustained arrythmia."  (R. 502).  The next month, on November 1, 2006, Dr. Bump described the palpitations as "extremely severe and disabling" and said they "correspond chiefly to frequent premature fascicular beats (a variant of premature ventricular beats)."  Dr. Bump further noted that Mr. Hughes could not tolerate beta-blocker therapy and that he has been treated with increasing doses of Flecainide.  But, higher doses caused Mr. Hughes dizziness and nausea.  The doctor planned on changing the medication for the palpitations to Rythmol.  (R. 447).  The following week, on November 8, 2006, Dr. Bump noted that the Rythmol (Propafenone) had not produced an improvement and that

Mr. Hughes remained "very symptomatic from his frequent ectopic beats." Dr. Bump felt multiple extra systoles in Mr. Hughes' pulse. He increased dosage of Propafenone to try to help Mr. Hughes with his "highly symptomatic extra systoles." Dr. Bump noted that Mr. Hughes was not a good candidate for an ablation, as this procedure would cause significant risk of causing complete heart block and pacemaker dependency. (R. 446).

On November 17, 2006, Mr. Hughes told Dr. Bump that the increased dosage of Rhythmol had only helped for a couple of days. Once again, Dr. Bump described Mr. Hughes as suffering from "highly symptomatic fascicular beats." His examination once again revealed frequent extrasystoles. Given the lack of response to prior medication, Dr. Bump began a trial of Mexiletine, another arrhythmia drug. (R. 505). Unfortunately, this caused severe side effects and made Mr. Hughes feel "worse than he ever felt in his life." On December 1, 2006, his condition remained "extremely symptomatic." At that time, Dr. Bump described "the highly symptomatic premature ventricular beats (as) probably arising from a fascicle of the left bundle branch block." As Mr. Hughes told the doctor that the Rythmol had worked to best – although it did not eliminate the premature beats, Dr. Bump restarted Mr. Hughes on the higher dosage of Rhythmol. (R. 444).

On January 20, 2007, Mr. Hughes was back at the Christ Hospital emergency room, complaining that he felt like he was going to pass out. (R. 268-75). His palpations seemed to be occurring more frequently and there was also some chest pain and shortness of breath. An ECG revealed frequent premature ventricular complexes and possible premature atrial complexes with aberrant conduction. (R. 274). The diagnosis was palpitations, and Mr. Hughes was released and advised to follow up with his doctor.

Mr. Hughes had an echocardiogram with doppler on January 29, 2007, at Loyola University Medical Center, which revealed a sinus rhythm with frequent premature ventricular complexes. (R. 743-44). On February 5, 2007, Mr. Hughes was admitted to Loyola for a cardiac catheterization and biopsy procedure which was done under sedation. (R. 746). The idea was to rule out a heart disease known as ARVD (arrhythmogenic right ventricular dysplasia) (R. 767) and, indeed, the procedure did not reveal evidence of RV dysplasia. (R. 811). The biopsy was also deemed unremarkable. (R. 815).

Following the testing, Mr. Hughes went to see a rheumatologist, Dr. Manjari Malkani, regarding his ongoing chest wall pain and diffuse body aches and fatigue. Dr. Malkani ruled out a cardiac source for the pain and a possible musculoskeletal source for pain was explored. In the past Dr. Malkani stated that physical therapy seemed to worsen the problem and medication that had been prescribed led to gastrointestinal side effects. The doctor also noted Mr. Hughes' history of "having a poor sleep pattern with excessive daytime drowsiness and daytime fatigue." Dr. Malkani's examination revealed that there were "significant tender points of fibromyalgia for which I would like to start Flexeril." The doctor also wanted to get x-rays of Mr. Hughes' hands and feet. (R. 439).

Mr. Hughes next visited John Lincoln Hospital, where he sought treatment for blurry vision, chest pain, and right arm numbness on April 22, 2007. Mr. Hughes also reported he was still getting intermittent chest pain and palpitations. (R. 384). At subsequent ophthalmological examination on June 25, 2007, Mr. Hughes said he was having throbbing eye pain in both eyes intermittently since April 2007, and sharp pain since before April. Dr. Ziemanski indicated Mr. Hughes suffered from a vitreous

7

detachment and multiple floaters in both eyes. The doctor said the floaters which were observed could be removed however there would be potential complications from the procedure; these were explained to Mr. Hughes. (R. 395). Mr. Hughes next saw a retinologist, Dr. Pelzak, in July of 2007, and then another ophthalmologist, Dr. Laura Sanders, in September and October of 2007. Dr. Sanders noted that Mr. Hughes was having pain around the orbits which would throb and vary in intensity. Mr. Hughes reported seeing shadows, reflections, and of being extremely sensitive to transferring from a dark to a light environment or vice versa.

Dr. Sanders noted that Dr. Pelzak had informed Mr. Hughes that he had a complete vitreous detachment of the left eye and a 75 percent vitreous detachment of the right eye. Dr. Sanders confirmed these findings in dilated fundus examination. She initially diagnosed Mr. Hughes with dry eye syndrome, based on testing which revealed "severely low" eye moisture. She gave Mr. Hughes a trial of artificial tears, but within two days Mr. Hughes reported that the eye drops were causing more irritation and blurriness. Dr. Sanders recommended a change to Visine preservative free drops. She also suggested that Mr. Hughes' complaints of headaches, nausea, and ongoing visual problems may have a neurologic component, as she could not explain the source for Mr. Hughes' severe pain and visual scintillations. (R. 402-03).

Next, Mr. Hughes saw Dr. Michael Schwartz, a neurologist, on September 12, 2007. Dr. Schwartz' felt that "some of his complaints appear to be related to a beta-adrenergic overflow syndrome," noting that in the past Mr. Hughes had been unable to tolerate beta blockers that had been prescribed. It was also Dr. Schwartz' opinion that a mandibular joint dysfunction was related to the head/ear complaints. The doctor did not

believe that all of Mr. Hughes' complaints were attributable to one single syndrome.  (R. 407-09).

Mr. Hughes sought counseling for the anxiety and stress he was experiencing at Metropolitan Health Services beginning in late October of 2007.  (R. 594).  Staff clinical notes stated that Mr. Hughes was labile, sad and irritable; he became tearful, overwhelmed and irritable.  The mood swings were not considered related to a bipolar disorder but rather related to Mr. Hughes' response to stress. (R. 572-73).  Mr. Hughes was further noted to have decreased energy, feelings of hopelessness and sleep disturbance. (R. 575).  These symptoms were also related to what was described as Mr. Hughes' "stress response due to coping with medical condition(s)."  (R. 575).  It appeared to the staff that Mr. Hughes was under a significant amount of stress . . . [which] greatly impacted [his] ability to manage challenges, has caused tearfulness, disputes with family members, and prevented [him] from wanting to engage with others." (R. 577).  The diagnosis was "Adjustment Disorder, Unspecified."  (R. 578).

In November of 2007, Mr. Hughes returned to Loyola and had a rheumatology consultation with Dr. John Robinson and Dr. Paula Marfia.  Dr. Marfia believed that Mr. Hughes' problems were more consistent with fibromyalgia and depression more than any rheumatologic illness. (R. 719).  Dr. Robinson felt that Mr. Hughes needed psychiatric intervention and had symptoms of obsessive compulsive disorder and severe chronic pain syndrome with a past history of panic attacks.

In January of 2008 and again in March of 2008, Mr. Hughes saw Dr. Janet Noel at Loyola for endocrinology consultations. Dr. Noel indicated that Mr. Hughes has a history of empty sella syndrome (shrunken pituitary gland), early diabetes, as well as

many of the symptoms already described which she characterized as "complex, multiorgan symptoms which all started in June 2006" (R. 708). Although Mr. Hughes denied psychiatric problems, Dr. Noel called Mr. Hughes "a very anxious person." (R. 713).

Mr. Hughes started seeing a new primary care physician in June of 2008 at Loyola, Dr. Milton Legrand. The doctor termed his medical history as "complicated" and opined that Mr. Hughes had "an obsessive compulsive personality" disorder. Dr. Legrand also questioned whether Mr. Hughes might be suffering from other psychiatric impairments, and recommended a psychiatric referral. (R. 695).

In early September of 2008, Mr. Hughes returned to Loyola with increasing episodes of dizziness and nausea. (R. 685). Later that month, after a followup examination, Dr. Legrand "suspect[ed] that (Mr. Hughes) has an underlying personality disorder," noting that Mr. Hughes was insistent that he had a "'medical mystery' that has not been found yet." (R. 684). In October 2008, Mr. Hughes had an otolaryngology consultation for ongoing ear and neck pain and a pain consultation related primarily to the chest/shoulder/armpit problems. (R. 681). Mr. Hughes was provided with Neurontin and given a Tens unit. (R. 676). After these consultations, Mr. Hughes saw Dr. Legrand again, complaining of worsening testicular pain. (R. 675-76).

In March 2009 endocrinology consultation, it was noted that Mr. Hughes had low testosterone levels and blood in his urine with a testicular infection that required antibiotics. (R. 672). In June of 2009, Mr. Hughes saw Dr. Legrand, and others, for headaches, sinus pressure, ongoing dizziness, myalgias, and sweats. (R. 669-71).

In January of 2008, Mr. Hughes saw Dr. Dominick Optiz for his visual problems and a new eye drop – Restasis – was considered for Mr. Hughes' Keratoconjunctivitis sicca, or dry eye syndrome. (R. 659). Dr. Optiz wanted Mr. Hughes to use Zylet for his eye problems as well. (R. 660). In May of 2008, ongoing symptoms including blurry vision with no improvement. Oasis eye drops were tried, but Mr. Hughes did not like them and that they felt sticky. Mr. Hughes complained of a stabbing pain in the eye and said he felt as if his eyes were straining toward his nose in a cross-eyed manner. (R. 651). Mr. Hughes' subjective symptoms were not considered consistent with any ocular anomaly and Dr. Optiz suggested that the symptoms might be "psychosomatic." (R. 651). Dr. Optiz also recommended that Mr. Hughes try and obtain another eye doctor opinion. Dr. Optiz next saw Mr. Hughes in November 2008.

In July of 2008, Mr. Hughes saw a neuro-ophthalmologist at Loyola and was diagnosed with Rosacea/Blepharitis, or inflammation of the eyelid and vitreous detachment. (R. 667-68). Ongoing eye problems included blurred vision, as well as pain, burning, and itching. There had been no changes to his symptoms of floaters and flashing that had been affecting Mr. Hughes for about two years. Mr. Hughes indicated he was using the Optive eye drops ten times a day, and the doctor told him to continue doing so. (R. 650). The next month, Mr. Hughes complained to Dr. Optiz that he was going "though a hell period" with his eyes, with symptoms of pain and pressure around the orbits. He was using hot compresses. The Optive drops were helping with the blurriness. Dr. Optiz diagnosed Mr. Hughes' symptoms to be related to Chronic Posterior Blepharitis – inflammation of the eyelids. (R. 649).

In April of 2009, Mr. Hughes reported ongoing symptoms including stinging and blurriness.  He was using the eye drops "all day" and was advised to use "warm compresses [three times a day]."  In May and June of 2009, there was improvement, and Mr. Hughes reported feeling better.  But by July, he was again experiencing pain as well as a foreign body sensation in both eyes (+FBS).  Tylenol was prescribed and Mr. Hughes was advised to continue to use Optive eye drops.  (R. 645-48).

Mr. Hughes' primary care physician, Dr. McGarry, retired and Dr. Derek Olsen took over his practice.  When contacted by the state disability agency in October 2007, Dr. Derek Olsen explained that he hadn't seen Mr. Hughes, but reviewed his records from his visits with Dr. McGarry.  Dr. Olsen concluded that, "(b)ased on the evidence in the record, the patient does have conditions, particularly the anxiety and the tachycardia, that could be exacerbated by stresses-both physical and mental, both in daily life and in the workplace" (R. 506).  The doctor reported that Mr. Hughes' heart problems were being treated with Altenol, his diffuse pain with trigger point injections and physical therapy – which had been of limited benefit, and his anxiety with Zoloft and Klonopin. (R. 506).

On December 31, 2007, Dr. Glen Pittman reviewed the medical record on behalf of the agency.  (R. 557).  He noted that Mr. Hughes suffered from an anxiety-related disorder.  (R. 545).  He further found that, although the impairment did not meet the listings, Mr. Hughes did have moderate limitations in his activities of daily living and social functioning, and a marked limitation in his ability to maintain concentration, persistence, or pace.  (R. 556-57).  Dr. Pittman also noted moderate limitations in the areas of understanding and remembering instructions, carrying out detailed instructions,

working in coordination or proximity with others, interacting with the public, getting along with co-workers, responding to changes in a work setting, and setting realistic goals and making plans independently. (R. 596). There were marked restrictions on Mr. Hughes' ability to maintain attention or concentration for extended periods, perform activities within a schedule and maintain attendance and punctuality, and complete a normal workday without interruption from psychological symptoms and perform at a consistent pace. (R. 596). With regard to his physical symptoms, there was "an extreme emotional overlay to all his complaints." (R. 597). The doctor felt Mr. Hughes was incapable of performing simple, unskilled work. (R. 597).

The agency had one of its psychologists, Walter Rucker, review Dr. Pittman's findings in February of 2008. He indicated that he disagreed with all of the limitations Dr. Pittman had found. (R. 606, 609). He said there was no mention of anxiety after September and October of 2006, speculating that it had been successfully treated with Zoloft. (R. 611). He opined that there was no evidence of a severe mental impairment before the DLI of September 30, 2006. (R. 611).

Apparently in light of the psychologist's report, on March 17, 2008, Dr. Pittman was asked to review his earlier findings and determined there was no severe impairment prior to the DLI of September 30, 2006. (R. 616, 628). This time he found no marked restrictions and not even any moderate restrictions – only mild. (R. 626). Another psychologist, Ellen Rozenfeld, reviewed the record in February of 2009, and also included there was no severe psychological impairment prior to September 20, 2006. (R. 640). She noted there was no evidence of treatment for a mental impairment prior to July of 2006, when Mr. Hughes was prescribed Zoloft and Klonopin. (R. 640). She also

stated that Mr. Hughes cared for his two younger children, shopped, handled the finances, and cleaned on a good day.  (R. 640).

## C.

### Administrative Hearing Testimony

### 1.

### Plaintiff's Testimony

At his hearing, Mr. Hughes testified that he was married and had three children – ages three, six, and seven.  (R. 34).  He explained that his previous jobs had been high stress.  (R. 38).  He had trouble dealing with production goals.  (R. 37).  When asked what limited his ability to work, Mr. Hughes said "pretty much everything . . . ."  (R. 40). He had blurry vision and flashes in his vision.  (R. 40).  He said he saw millions of stars when he looked at a light source, like a computer screen.  (R. 41).  He still drove, but only when necessary, like for doctor appointments.  (R. 41).  Mr. Hughes also said he had heart issues, including constant irregular heartbeats, shortness of breath, and chest pain. (R. 44).  He was previously on a lot of medication, but his system couldn't handle it.  (R. 44).  He couldn't function normally, and he and his family had to move in with his parents.  (R. 44).  He was told by doctors he had to live with it.  (R. 45).  He said he was "never going to know when the big one is here and to call 911. Because in the beginning, I had called 911 and went to the emergency room. . . thinking this is the heart attack. They tell you when you feel this kind of thing you call and you be responsible so that you don't die and I'm young and I have a family that I have to take care of. I don't want to die . . . ."  (R. 45).  His doctors told him he should limit his activity to whatever he felt capable of.  (R. 46).

Mr. Hughes also spoke of his eye pain (R. 50), his joint pain and fatigue (R. 48, 50), his dizziness (R. 49), his sleep disturbance (R. 54), and his panic attacks and anxiety. (R. 57). With respect his mental health, Mr. Hughes testified that he has "issues adjusting to what is happening to my body. I can't just be normal again kind of thing and I'm having issues getting over that in addition to when I start to think about these things. I become in a closed loop of worrying about am I going to go blind, am I going to have the heart attack, what's going to happen which causes me to become short of breath and it just makes everything worse, because it makes my heart beat stronger and I don't want that. And it – everything compiles down to the point where I am a mental wreck and I can't function basically." (R. 58).  He said he had to lay down fifteen times a day due to fatigue and pain.  (R. 65).

## 2.

### Vocational Expert's Testimony

Thomas Guslove then testified as a vocational expert ("VE").  He classified Mr. Hughes's past work as sedentary work, which was semi-skilled to skilled.  (R. 68).  The ALJ asked the VE to assume a person could perform all exertional levels of work, but was limited to simple, one- or two-step tasks in a work environment where his duties didn't change and he only occasionally was in close proximity to other workers, had no contact with the public, and had a flexible pace.  (R. 69).  The VE said that such a person could not perform Mr. Hughes' past work because of the skill level, but could perform jobs like folding machine operator (20,770 jobs in the area), shipping checker (1330 jobs), or mail clerk (4870 jobs).  (R. 69).  If that person's vison blurred during work and

they had to rest ten minutes every hour, the VE said they would not be employable. (R. 70). Frequent, unscheduled breaks would have the same effect. (R. 70).

## D.

### ALJ's Decision

The ALJ found that Mr. Hughes suffered from the following impairments: "heart palpitations, dry eye, adjustment disorder, anxiety disorder." (R. 12). Through the date last insured, however, the ALJ determined that Mr. Hughes' "did not have an impairment or combination of impairments that significantly limited his ability to perform basic work activity for 12 consecutive months; therefore, [he] did not have a severe impairment or combination of impairments." (R. 12). She said that none of the cardiac tests revealed any functional or work-related limitations. (R. 15). Treatment was routine and conservative. She noted that there were many instances where Mr. Hughes "took issue with recommended treatment, and therefore chose not to follow his doctors' recommendations, further diminishing the credibility of his allegations . . . ." (R. 15). She also felt that the objective evidence did not support his allegations that he suffered anything more than minimal work-related limitations. (R. 16). She rejected the report from Dr. Olson, saying that he "had not even personally seen the claimant, and simply reviewed his 2006 medical findings . . . ." (R. 20).

The ALJ also noted that there was no evidence of a visual impairment. Vision testing had always been 20/20. (R. 16-17). Mr. Hughes himself said his eyes felt better than they had in three years. (R. 17). The ALJ recounted that Mr. Hughes testified that he drives a car, cared for his children, graded their schoolwork, cleaned his home, and cooked three meals a day. (R. 17).

The ALJ moved on to the question of Mr. Hughes' psychological impairment. She rejected the initial assessment of Dr. Pittman as being inconsistent with the record. (R. 18). Instead, she accepted the assessment of the psychologist, Dr. Rucker, that Mr. Hughes had no severe impairment, and Dr. Pittman's reassessment in lieu of Dr. Rucker's findings. (R. 19). The ALJ also referred to Dr. Rozenfeld's similar assessment. (R. 19). The ALJ then determined that Mr. Hughes had mild limitations in the areas of social functioning, concentration, no limitation in daily activities, and no episodes of decompensation, relying on Drs. Rucker and Rozenfeld, and Dr. Pittman's reassessment. (R. 19-20). As a result, the ALJ determined that Mr. Hughes did not have a severe impairment and was not disabled through the expiration of his insured status on June 30, 2008. (R. 20-21).

## IV.

## DISCUSSION

## A.

### Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. §§ 405(g). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept to support a conclusion.'" *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010)(*quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The court may not reweigh the evidence, or substitute its judgment for that of the ALJ. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009); *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). Where

conflicting evidence would allow reasonable minds to differ as to whether the claimant is disabled, it is the ALJ's responsibility to resolve those conflicts. *Elder v. Astrue*, 529 F.3d 408 (7th Cir. 2008); *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). An ALJ is required to "minimally articulate" the reasons for his decision. *Berger*, 516 F.3d at 544; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the claimant a meaningful judicial review. *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009). The Seventh Circuit calls this building a "logical bridge" between the evidence and the ALJ's conclusion. *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996).

## B.

### Five-Step Sequential Analysis

The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment;

3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff unable to perform any other work in the national economy?

20 C.F.R. §§ 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. 20 C.F.R. §416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan,* 892 F.2d 43, 44 (7th Cir. 1990). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled. 20 C.F.R. §404.1520; *Stein*, 892 F.2d at 44. The claimant bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352, *Brewer v. Chater,* 103 F.3d 1384, 1391 (7th Cir. 1997).

## C.

### Analysis

This case is a poster-child for the Seventh Circuit's "logical bridge" requirement. It may well be that the record could support a finding that Mr. Hughes is not disabled. He certainly sought treatment often and for an array of problems, but there is very little from his physicians that says he is disabled. Whether the record supports a finding that he has no severe impairment is a tougher sell. A severe impairment is an "impairment or combination of impairments which significantly limits [one's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 404.1521(a).

Basic work activities are "the abilities and aptitudes necessary to do most jobs," including "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling." 20 C.F.R. § 404.1521(b). "An impairment or combination of impairments is found 'not severe' and a finding of 'not disabled' is made at [step two] when medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education, or work experience were specifically considered ( *i.e.,* the person's impairment(s) has no more than a minimal effect on his or her physical or mental ability(ies) to perform basic work activities)." *Bowen v. Yuckert*, 482 U.S. 137, 154 (1987)(quoting SSR 85-28).

The severe impairment requirement has been termed a *de minimis* requirement designed to weed out frivolous claims. *Johnson v. Sullivan*, 922 F.2d 346, 347 (7th Cir. 1990). In other words, it's more difficult to argue that the record supports a finding that Mr. Hughes has no more than a slight abnormality than it would be to say he can do work that exists in significant numbers in the economy.

But the problem with the ALJ's decision is that she failed to adequately trace the path of her reasoning between the evidence and the conclusion. It doesn't matter if the evidence supports her ultimate conclusion. The Seventh Circuit has held that "we cannot uphold a decision by an administrative agency, any more than we can uphold a decision by a district court, if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996).

Here's the flaw in the ALJ's logical bridge analysis. In determining that Mr. Hughes' mental impairment imposed either no, or only mild, limitations on the relevant areas of his functioning, the ALJ repeatedly relied on the assessments of the two non-examining psychologists and the do-over of the non-examining psychiatrist. But all three of those opinions assumed a date last insured of September 30, 2006. That's a mistake of almost two years, as the actual date last insured is June 30, 2008. So those three opinions are based on a serious flaw, and as the ALJ relies, to a great extent, on all three, her opinion is substantially based on the same flaw.

Moreover, although the ALJ herself acknowledged that the date last insured was June 30, 2008, she made no mention of the flaw in the three opinions she relied upon. As such, she never dealt with it, never weighed in her assessment of the various medical opinions in this case. The Commissioner's brief argues that the opinions were probative of Mr. Hughes' condition through September 2006, and that the ALJ simply picked up the reasoning from there, assessing the ensuing years on her own and finding there was no need to discard the three opinions. But there is nothing like that line of reasoning in her opinion. Rather, the ALJ relies extensively on the three opinions, according them "great weight." (R. 18-19). It is the ALJ's rationale that is before the court for review and not the arguments of the Commissioner's very able and experienced lawyers. *Carter v. Astrue*, 2011 WL 917000, *5 (7th Cir. 2011); *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010); *Campbell v. Astrue*, 627 F.3d 299, 307 (7th Cir. 2010).

As just noted, the ALJ said she accorded "great weight" to the opinions of the non-examining psychologist and the second, but not the first, opinion of the non-examining psychiatrist. She said they were "very consistent with the claimant's sparse

21

mental health record." That may well have been the case prior to the incorrect date last insured. At that point, Mr. Hughes' treating physician had first mentioned that Mr. Hughes was "very anxious" and prescribed him first Buspar and then Zoloft and Klonopin. (R. 453). But, contrary to the reviewers' opinions, that was not the last mention of a mental health problem. After the incorrect date last insured, several physicians remarked upon Mr. Hughes' mental health. Dr. Shahbain said he was suffering from anxiety and probable depression (R. 458), while Dr. Bump described him as "highly anxious and distressed" and expressed concern for his patient's emotional and mental state. (R. 500).

Mr. Hughes started once-a-week individual therapy sessions in October 2007, during which it was variously noted that he was labile, sad, irritable, tearful, hopeless, and suffering from mood swings. (R. 572-73, 577). When Dr. Robison saw Mr. Hughes at Loyola, he recommended psychiatric intervention, as he was exhibiting symptoms of depression. (R. 717-20). In June 2008, Dr. Legrand – Mr. Hughes' new primary care physician – diagnosed him with an obsessive compulsive disorder, and recommended a psychiatric referral. (R. 695).

That may not be a record that dictates a finding of a severe impairment, but neither is it "sparse." And, more importantly, the reviewers' consideration of Mr. Hughes' medical history ended at a cut-off date prior to Mr. Hughes' visits with all of the aforementioned physicians. Under the regulations, an ALJ has to consider several factors in determining how much weight to accord the opinion of a "non-examining source" that reviews the record for the agency and explain her determination. 20 CFR §404.1527(f)(2)(ii). The factors include the fact that the reviewer has no treatment or

examining relationship with the claimant, whether the opinion is supported by relevant evidence and is consistent with the record as a whole, and the reviewer's area of specialization. 20 CFR §404.1527(d). Here, the ALJ mentioned only the supportability and consistency of the opinions and, as has been seen, the opinions actually ignored a fair amount of relevant evidence due to the mistake regarding the date last insured. As such, she failed to provide an adequate explanation of why she assigned great weight to these flawed opinions, and so, there is not an adequate "logical bridge" from the evidence to her conclusion.

Because of the apparent significance of the reviewers' opinions to the ALJ's ultimate conclusion, this problem alone necessitates a remand. But there are some other problems worth mentioning. Assessing the opinion from Dr. Olson – another non-examining physician opinion who reviewed the records he took over from Mr. Hughes' previous doctor – she explained that it was entitled to no weight at all because Dr. Olson had never examined Mr. Hughes and his report was not supported by the record when viewed in its entirety. (R. 20). One can question the logic of citing the fact that Dr. Olson was a "non-examining source" as detracting from his opinion while assigning "great weight" to internally flawed opinions from other non-examining sources, but more troubling was how the ALJ summed up the record that didn't support Dr. Olson's opinion: she said there were no opinions from "treating or examining physicians indicating that [Mr. Hughes] is disabled or has more than minimal functional limitations." (R. 20, *se also* 16).

That statement is inaccurate. The ALJ apparently ignored the records from Dr. Bump, who examined and treated Mr. Hughes in 2006. Dr. Bump stated that he thought

Mr. Hughes' cardiac problems – perhaps combined with his emotional problems – were disabling or very disabling or extremely severe on more than one occasion. (R. 447, 500). The ALJ didn't have to adopt these opinions, but she couldn't ignore them. *Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010); *Terry v. Astrue,* 580 F.3d 471, 477 (7th Cir.2009). And if she wanted to discard them or assign them little or no weight, she had to provide good reason for doing so. *Simila v. Astrue*, 573 F.3d 503, 515 (7th Cir. 2009); *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008). Her failure to do so is a bit more significant in this case because she based her decision on opinions from non-examining reviewers. "ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003).

The ALJ also cited the lack of any opinions that Mr. Hughes was disabled as undermining his credibility. Obviously, that was a flawed rationale. She also focused on Mr. Hughes' daily activities: caring for his children, grading their school work, cooking 3 meals a day, driving, and playing video games. (R. 19). But that list is just a gloss on Mr. Hughes' description of his daily activities. Mr. Hughes explained that his health problems greatly restricted his ability to care for his children. (R. 565, 567). In fact, he had to move his family in with his parents so they could help him take care of the kids. (R. 721). At that point, he was unable to fulfill his role as primary caregiver. (R. 721). He said that he had trouble driving due to his vision problems and drove only when necessary. (R. 41). As far as doing things around the house, he had to take frequent breaks to rest – up to fifteen per day. (R. 65). "An ALJ may not ignore a claimant's

limiting qualifications with regard to h[is] daily activities." *Jones v. Astrue*, 623 F.3d 1155, 1162 (7th Cir. 2010); *Moss v. Astrue*, 555 F.3d 556, 562 (7th Cir. 2009). But, clearly, that's what the ALJ did here.

It might be added that the ALJ also did not give proper consideration to the side effects Mr. Hughes experienced from his medication. She merely indicated that Mr. Hughes "took issue with recommended treatment (R. 15), ignoring the repeated mentions in the record of his difficulty tolerating certain medications due to side effects. An ALJ can't ignore evidence of side effects of medication and make an adverse credibility finding due to a claimant's non-compliance with treatment. "[N]egative side effects from medication may excuse failure to pursue treatment." *Myles v. Astrue*, 582 F.3d 672, 677 (7th Cir. 2009); SSR 96-7p at *8. The ALJ had to explore and discuss the reasons why Mr. Hughes "took issue" with his prescribed regimen. *Moss*, 555 F.3d at 562. Instead, she took his reluctance to continue with certain medications out of context.

## CONCLUSION

The plaintiff's motion for summary judgment or remand [#15] is GRANTED, and the Commissioner's motion for summary judgment is DENIED.

ENTERED: _____

UNITED STATES MAGISTRATE JUDGE

**DATE:** November 21, 2011

25